## HARGROVE *v.* THE STATE.

1. Neither the joinder of a witness in an' indictment with the defendant, nor a plea of guilty entered by the witness, *necessarily* makes him an accomplice with the defendant so as to require corroboration of the witness's testimony on the latter's trial. It is for the jury, from a consideration of the testimony of the witness, wherein he admits his presence at the scene of the crime at the time of its commission by his codefendant, but denies any participation therein by him, and the plea of

guilty entered by the witness, as well as any other relevant circumstance, to determine whether the witness was an accomplice of the defendant on trial.

2. The court properly left it for the jury to decide, under the evidence, whether the codefendant testifying was an accomplice; and the verdict may be upheld on the theory that the jury found that the witness was not an accomplice.

3. Even on the contrary assumption that the witness was an accomplice, there was evidence from an extraneous source sufficient to corroborate the accomplice as to participation by the accused in the criminal act.

Argued April 16,—Decided May 11, 1906.

Indictment for murder.  Before Judge Roan.  Fulton superior court.  February 17, 1906.

*John B. Suttles* and *Frank L. Haralson,* for plaintiff in error.

*John C. Hart, attorney-general,* and *Charles D. Hill, solicitor-general,* contra.

EVANS, J.  Jim Hargrove and Joe Lane were jointly indicted for the murder of Middleton P. Harwell.  Lane entered a plea of guilty, and Hargrove was convicted by the jury of murder and recommended to mercy.  A motion for a new trial was made by Hargrove, on the ground that the verdict was contrary to law and the evidence.  The motion was overruled, and the sole question presented by the bill of exceptions is whether or not the evidence was sufficient to sustain the verdict.  The deceased was a watchman in the freight-yard of the Western and Atlantic Railroad Co.  Just after dark another watchman heard two pistol shots, and immediately saw a negro running by the round-house; he was a yellow negro, and the witness thought it was Joe Lane, but was not sure.  The dead body of the deceased was found in the yard between the railroad tracks.  There were cars on the track where his body lay.  The deceased was killed by a gunshot wound, and the bullet which was extracted was number 41 calibre.  Joe Lane testified that Jim Hargrove shot and killed the deceased.  His testimony was substantially as follows: He had known Hargrove about three years, and they had been at work together hauling baggage.  They had also been associated together in committing a number of thefts, and on the night of the homicide went down to the railroad yards for the purpose of stealing.  Jim said that he was going down there to get him a tub of lard that he saw down there that day.  They drove down an alley in the rear of a hardware store on Marietta street and stopped under a bridge, where Jim left the witness in

charge of the baggage-wagon. This was about 6 o'clock p. m. It was raining and was getting pretty dark. Jim was gone so long that the witness became uneasy and went down in the railroad-yard to see where he was, saw a man between some cars, and, as Jim jumped off the car in front, witness looked and "seen a pair of legs, and it was a white man. Jim straightened up and walked down under the car and came around the car and met the white man on the main line, on the railroad track where he was. They both stood and looked at one another; and about that time Jim shot twice, and [the other man] ran back and halloed and kind of struck at him that way, and then ran back and, holloed and fell on his back." Jim "put out" towards the W. & A. round-house, and witness went right back to the wagon the way he had come, not stopping to look at the deceased after he fell. Witness then went across town and met Jim in front of a candy factory, and they drove around Mitchell street and came back to the depot and got a load of trunks, and stayed together till they went to the shed at quitting time, about 8 o'clock that night. They did not on that night (Saturday) visit Mattic Bryant, who claimed to be Jim's wife, but did meet at her house on Monday night. Witness first heard of Harwell's death on the morning after the homicide, about six o'clock, when Jim came to the house in which witness lived, and called him out on the porch and read to him the newspaper account of the killing. Jim, after reading the paper, said: "That man is dead I shot last night. Don't you never breathe it. If I hear it again I will know you told it, because nobody knows about it but me and you; you was there and I was there, and I ain't going to tell it; and if you ever tell it, I will know where it came from." Witness replied that he "wouldn't tell it." After the shooting, Jim pawned the pistol; tried to get witness to pawn it in his name, and tried to get Will Davis to pawn it in his own name, saying he could get more for it that way; Will would not do it, but did pawn the pistol for Jim in Jim's name. Witness had once, on the 30th of May, borrowed the pistol, but Jim would never afterwards let him have it. The pistol belonged to Jim, and he did the shooting with it. Witness knew, when they drove down to the railroad yards, that they were going there to steal, but they "didn't get any chance to steal," and witness did not know anything about whether Jim was going to kill a man or not, and had nothing to do with the killing.

Certain other facts were shown, which will be adverted to here-after in connection with the discussion of the corroboration of the testimony of this witness. The accused offered certain evidence tending to account for his presence elsewhere, and also to show that Joe Lane had confessed to the killing and denied that the accused was present or in any way connected with the homicide. The accused also made a statement denying his guilt, accounting for his whereabouts at the time of the homicide, and asserting that Joe Lane had taken his pistol from the wagon the day before the killing and returned it to him just after the homicide, with an ad-mission that he had killed the deceased. The trial judge, in his charge, instructed the jury what was necessary to make one an accomplice in crime, and left it for them to decide whether under the evidence the witness Joe Lane was an accomplice. The jury were further instructed that if they should find that the witness was an accomplice, his testimony would be insufficient to convict the accused, unless corroborated by other evidence connecting the defendant with the perpetration of the offense. In a consideration of the sufficiency of the evidence to warrant the verdict, we will first ascertain whether the facts compelled a finding that the witness was an accomplice. For if he was not an accomplice, his testimony was direct and positive as to the defendant's guilt, and, if believed by the jury, amply supported the verdict.

Mere presence at the commission of a crime does not render the spectator an accomplice with the actual perpetrator. "Participation in the commission of the same criminal act and in the execution of a common criminal intent is necessary to render one criminal, in a legal sense, an accomplice of another; and if between two persons who may be engaged in a criminal enterprise, in the execution of which two separate offenses may be committed, there is not this concurrence of act and intent, though each may commit a crime, neither is, in legal contemplation, an accomplice with the other." *Springer* v. *State,* 102 *Ga.* 447. Although a witness may have been present at or near the scene of the crime, and may have concealed the fact for a time, yet if he did not in any way aid, abet, procure, or participate in it, he is not an accomplice. *Allen* v. *State,* 74 *Ga.* 769; *Lowery* v. *State,* 72 *Ga.* 649. The jury had the right to accept as true the account given by Joe Lane of the homi-cide and the circumstances leading up to and attending it; in

which event, he was not an accomplice. The only evidence which connected the witness with the homicide was his alleged admission of it and his conviction of the same murder. The witness denied he ever admitted killing the deceased. So the whole matter is resolved into the effect of his admission of having pleaded guilty to the indictment. The burden of proving a witness to be an accomplice is upon the party alleging it for the purpose of invoking the rule. The joinder of the witness in an indictment with the defendant is insufficient to show the witness to be an accomplice. *Davis* v. *State*, 122 *Ga.* 564. As between the State and the witness, his plea of guilty is conclusive of his guilt as a principal; but as between the State and the defendant on trial, it can not be more effectual against the State than it would be against the defendant, and clearly he would not be bound by the plea. Besides, the plea does not necessarily include the idea of joint participation. When two are indicted for an offense which may be committed by one person, the conviction or acquittal of one does not affect the guilt or innocence of his codefendant. If, on the trial of the issue of the guilt or innocence of one of two persons jointly charged with crime, his co-indictee is offered as a witness to prove the guilt of the defendant on trial, and the testimony of the witness negatives his own participation in the crime, the defendant may disprove it. The plea of guilty of the witness to the indictment may properly be considered by the jury in determining whether the witness was an accomplice, but the plea is not conclusive on this point. See *Jackson* v. *State*, 54 *Ga.* 439. Therefore the judge properly left it for the jury to decide whether under the evidence the witness was an accomplice. Of course, we do not know how the jury arrived at their verdict; they may have found that the witness was not an accomplice.

But let us assume, for the sake of the argument, that Joe Lane, the witness on whom the State chiefly relied to establish the defendant's guilt, was an accomplice. It is necessary that the testimony of an accomplice be corroborated by evidence connecting the defendant with the perpetration of the offense, in order to authorize a conviction. It is not required that this corroboration shall of itself be sufficient to warrant a verdict, or that the testimony of the accomplice be corroborated in every material particular. *Taylor* v. *State*, 110 *Ga.* 151; *Dixon* v. *State*, 116 *Ga.* 186. Slight evi-

dence from an extraneous source identifying the accused as a
participator in the criminal act will be sufficient corroboration of
the accomplice to support a verdict. *Evans* v. *State, 78 Ga.* 351;
*Roberts* v. *State, 55 Ga.* 220. The sufficiency of the corroboration
of the testimony of the accomplice to produce conviction of the
defendant's guilt is peculiarily a matter for the jury to determine.
If the verdict is founded on slight evidence of corroboration con-
necting the defendant with the crime, it can not be said, as a matter
of law, that the verdict is contrary to the evidence. *Chapman* v.
*State,* 109 *Ga.* 165. On the trial it was shown that the accused
and the witness were intimate associates; whenever the delivery
wagon would go out with the accused as driver, the witness was
generally with him, and they stayed together almost all the time.
They were together on the day of their arrest. The accused ad-
mitted to the agent of the Western & Atlantic Railroad Co. that
he and the witness had been robbing the railroad company for over
two years. The deceased was the watchman of the W. & A. rail-
road-yard, and was killed in the yard of that company. It was ad-
mitted by the accused that the pistol which was used in firing the
fatal shot belonged to him. The witness and the accused were
committed to jail for the theft of some tobacco. While in jail the
accused wrote a letter to the woman with whom he was living,
which contained these extracts: "Well will Davis that I Pond My
Pistol I no if Lockhart ask him he will tell him you tell Mr. Moore
that Mr. Jones kept my pistol all the winter until I paid him what
money I got from him for you to go home tell him that I Pond my
Pistol 2 time February on the last time the 10 of Apler when that
man was kill it was in Pond;" "so you come and see me jest tell
him that you have mot the money to get the Pistol get him to write
you a note so you can see me for no Body have said anything to me
about kill that man yet." This letter was intercepted by the
jailor. It was admitted by the accused that Will Davis had pawned
the pistol at his request and in his name, subsequently to the homi-
cide. From the disclosures made in the letter the deputy sheriff
obtained the pistol from the pawnbroker. We think these facts
sufficient to connect the defendant with the commission of the
crime. When it is remembered that the accused had been robbing
the railroad cars with Joe Lane for years; that they were almost
inseparable companions, and that the deceased was killed in the

yard of the railroad company; that when in jail for another offense and before any accusation of murder had been preferred against him, the accused attempted to get his paramour to affirm that the pistol from which the fatal shot was fired was in the pawnshop at the time of the homicide, can it be said that his connection with the crime has not been shown? These circumstances are sufficient to support the testimony of Joe Lane that the defendant committed the homicide.

It is not necessary to go into the sufficiency of the evidence offered by the defendant to prove an alibi. It was rejected by the jury, either because it was not credible or because they thought it not inconsistent with the defendant's guilt. We think the evidence sufficient to warrant the verdict. It has been approved by the judge, and we will not interfere with the court's discretion in denying a new trial to the defendant.

*Judgment affirmed. All the Justices concur.*